IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALBERT PALACZ, ) | |
| ) | |
| Plaintiff, ) | No. 10 C 3413 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| THE VILLAGE OF HARWOOD HEIGHTS, an ) | |
| Illinois municipal corporation, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Albert Palacz has brought a five count second amended complaint against his former employer, The Village of Harwood Heights, Illinois, alleging discrimination based on his gender in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq. (Count I); retaliation in violation of Title VII (Count II); violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (Count III); breach of contract (Count IV); and violation of the Illinois Whistleblower Act, 740 ILCS 174/1 et seq. (Count V). Defendant has moved for summary judgment on all counts.[1] For the reasons discussed below, defendant's motion is granted in part and denied in part.

## **FACTS**

Plaintiff was employed with defendant's police department as a patrol officer starting July 10, 1989. In 2000, plaintiff was transferred to the department's investigation unit and was supervised by then Sgt. Mario Ricchio. Plaintiff was partnered with Detective John Devries.

---

[1] The court notes that plaintiff's 34 page memorandum in opposition to defendant's motion violates Local Rule 7.1 and this court's standing order, and admonishes plaintiff's counsel to comply strictly with the court's rules in the future.

In the Summer of 2006, while plaintiff was still in the investigation unit, he claims that then Chief Martin Podosek asked him to "look into" allegations that plaintiff's partner, Devries, was engaging in misuse of police time and resources, including fraudulently signing in for court and receiving court pay, and using police vehicles for personal business. This assignment was apparently "off the books" because there is no written documentation of it and, according to plaintiff, he was ordered to report his findings to Lt. Biagi without revealing that Podosek ordered the investigation. Podosek denies ever speaking to plaintiff about Devries, and denies asking plaintiff to conduct an investigation. Plaintiff completed an investigation and reported to Biagi that Devries was in fact receiving extra pay for time that he was not in court and was using police vehicles for personal business.

Shortly after reporting to Biagi, plaintiff went on a medical leave of absence. When he returned, Ricchio, now a captain, who apparently had his own personal issues with Podosek, informed plaintiff that his allegations about Devries had blossomed into an "official investigation." Ricchio conducted that investigation and sent his findings and recommendations to Podosek. That report blamed plaintiff for conducting an unsanctioned investigation into a fellow officer and recommended that plaintiff be suspended. Podosek testified that he does not remember seeing the report, but it is undisputed that plaintiff received no discipline.

After the "official investigation" was concluded, plaintiff no longer felt comfortable working under Ricchio and with Devries, and requested a transfer. This request apparently further irritated Ricchio because it would put a strain on his and the other detectives' work loads. At that time, Podosek had initiated a Village K9 Program and asked plaintiff, who had raised his own dogs, if plaintiff wanted to be the K9 officer. Plaintiff agreed and on September 28, 2006,

plaintiff, Podosek, and Tom Hockett, owner of TNK9 Inc., the dog breeder, signed what is titled "Law Enforcement K-9 Contract" (the "K9 contract"). Plaintiff took possession of a dog named Selene, and began the training process.

According to plaintiff, the standard work week for a Village police officer was eight hours per day and 40 hours per week. Any officer working in excess of 40 hours per week was paid at a rate of time-and-a-half the normal rate. Plaintiff claims that when he accepted Podosek's offer to become the K9 officer, Podosek promised him that he would be credited eight hours of "time due" and paid time off plus the same stipend that he received as a detective. This "promise" was apparently oral and there is no documentation to support this claim. According to Podosek, plaintiff was paid for eight hours each day but worked only seven. He was given one hour pay per day to care for the dog.

Plaintiff claims that in February 2007 Chief Podosek ordered him to have the canine spayed. Podosek testified that it was plaintiff who came to him requesting that the dog be spayed because plaintiff had two male dogs at home and that the dog would be training with other male dogs. Plaintiff did eventually have Selene spayed, but claims that he did so on orders from Podosek and that he told Podosek that spaying the dog might violate the K9 contract.

In January 2008, Ricchio and Devries, who was President of the Harwood Heights Fraternal Order of Police, began to seek a vote of "no confidence" in Chief Podosek and Mayor Margaret Fuller. Plaintiff told Podosek about Ricchio and Devries' plan. Podosek instructed plaintiff to speak with Fuller about the plan. Plaintiff did so, and claims that he told Fuller of his investigation into Devries, as well as of an order by Ricchio not to give <u>Miranda</u> warnings to arrestees immediately upon arrest.

3

On February 2, 2008, Devries led a meeting at which a "no confidence" vote was taken concerning Podosek and the mayor. Plaintiff claims to have spoken out against taking the vote. After the meeting, Ricchio accused plaintiff of speaking with Fuller about him. Plaintiff claims that Ricchio made veiled threats against him.

Fuller called plaintiff on February 11, 2008, and asked him to speak to the Village attorney about his allegations against Ricchio. Plaintiff met with the attorney on February 14 and discussed his investigation of Devries, Ricchio's <u>Miranda</u> order, and the no confidence vote.

On March 31, 2008, Podosek served plaintiff with papers requiring him to testify and cooperate with an official Village investigation into violations of law and department policy by a commanding officer. Devries and Ricchio were required to do the same. On April 8, 2008, plaintiff gave recorded testimony before Village attorneys regarding his allegations about Devries and Ricchio, including a threat by Ricchio to suspend officers if they "Mirandized" arrestees prior to Ricchio's interrogation. A Village order terminating that investigation was passed prior to Ricchio or Devries having to give any testimony. In May 2008, Captain Ricchio retired from the Department, claiming a hostile work environment created by Podosek.

On January 15, 2008, plaintiff was pepper sprayed during a training exercise. He developed a reaction to the spray that began with a respiratory infection and worsened into partial hearing loss and a diagnosis of vertigo. He was placed on medical leave on April 21, 2008, and remained out of work until December 25, 2008. He claims that he sought to return on "light duty" on April 24, but was told that there was no such thing as light duty. Podosek testified that plaintiff asked for light duty but never presented a note from his doctor clearing him to return to work. Until that time plaintiff's doctors had been reporting that plaintiff could not

4

return to work and might not ever be able to return. Podosek testified that plaintiff knew he needed a doctor's note to return to work, but admits that he never specifically told plaintiff that.

Sometime in December 2008, plaintiff learned that Officer Sharon Mortakis was granted light duty by Podosek based on her pregnancy. It is undisputed that Mortakis is the only officer to be assigned light duty during Podosek's tenure as chief, and that Mortakis's doctor had submitted a note requesting light duty. Also in December 2008, after learning that Mortakis was given light duty, plaintiff filled out an online Equal Employment Opportunity Commission ("EEOC") Intake Questionnaire indicating that he felt his denial of light duty was a result of sex discrimination.

Plaintiff returned to work in January 2009. On February 3, 2009, he was called in from patrol and accused of drinking before beginning his shift. According to Podosek, other officers had reported smelling alcohol on plaintiff's breath. Podosek spoke with plaintiff, did not smell alcohol and did nothing further. Plaintiff claims that Podosek berated him for filing for unemployment compensation for the period he was on medical leave, and for filling out the EEOC Intake Questionnaire. Podosek denies this, stating that he had absolutely no idea that plaintiff had contacted the EEOC. Two days later, plaintiff was again accused of drinking before duty by Sgt. Lymberis and Lt. Biagi. Plaintiff claims to have requested an attorney, but Podosek did not recall that. Plaintiff submitted to a breathalyser test which showed no alcohol content in his blood.

Approximately two weeks later, on February 20, 2009, Podosek officially disbanded the K9 Unit. Plaintiff was relieved of his duties as K9 handler, and signed a document titled "Letter of Agreement Between Village of Harwood Heights Police Department and Officer Albert

Palacz." According to that document, Harwood Heights had the "legal rights" to Selene, that Harwood Heights wished to discontinue use of Selene, that plaintiff wished to keep Selene as a personal pet, and that the parties agreed that plaintiff would assume full responsibility for the dog and hold Harwood Heights harmless for any harm or injury caused by Selene as of the date of the agreement. In addition, the parties executed a bill of sale by which plaintiff purchased Selene from Harwood Heights for $1.

In March 2009, Podosek left the department for a position in Marengo, Illinois. In May, newly elected Harwood Heights Mayor Arlene Jezierny appointed Ricchio as chief.[2] Ricchio then recommended the creation of a commander position and appointed Devries to that job. On May 26, 2009, plaintiff filed a formal charge of discrimination with the EEOC. Ricchio told plaintiff that he was aware of plaintiff's testimony and the EEOC charge, but harbored no ill will. In September 2009, TNK9 filed suit against the Village for breach of the K9 contract, based on Selene having been spayed. Hockett contacted plaintiff and indicated that plaintiff might also be sued. Plaintiff then signed an affidavit, filed in the TNK9 state court action, indicating that Podosek had ordered him to spay the dog.

On April 6, 2010, Ricchio had plaintiff served with papers commencing an investigation into plaintiff's participation in the TNK9 lawsuit. The notice indicated that "answers that you give, to questions asked of you during the investigation will not and cannot be used against you in any subsequent criminal proceeding."

On April 9, 2010, plaintiff was called into police headquarters and interrogated by Ricchio and the Village attorney. He was asked about his claim for workman's compensation,

---

[2]Ricchio's title was actually Chief of Public Safety.

his EEOC charge, and his affidavit in the TNK9 lawsuit, as well as a claim by a human rights employee of "electronic harassment," arising out of plaintiff's repeated requests for his own medical records. After plaintiff's testimony, Ricchio sought to have plaintiff charged by the Cook County's State's Attorney with "criminal maintenance" under 720 ILCS 5/32-12.

On May 11, 2010, Ricchio submitted a written request for plaintiff's termination. The first item in Ricchio's memorandum in support of that request indicates that plaintiff had filed an EEOC charge alleging retaliation, sex and disability discrimination against the department. On July 20, 2010, the Village submitted a notice of suspension without pay and complaint, requesting plaintiff's termination. Facing termination, plaintiff resigned on August 18, 2010.

## DISCUSSION

Defendant has moved for summary judgment under Fed. R. Civ. P. 56 on all counts. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant has the initial burden of pointing out the absence of a genuine issue of material fact. Once the movant has met that burden, the nonmoving party must go beyond the pleadings and present specific facts showing that there is a genuine issue for trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

**Count I - Gender Discrimination**

In Count I, plaintiff alleges that he was discriminated against based on his gender when he was denied light duty. The only evidence he has to support this claim is that Mortakis received light duty because of pregnancy. Plaintiff attempts to establish his "reverse sex discrimination" claim through either the direct or indirect method. Under the direct method, plaintiff must identify circumstantial evidence that points to a discriminatory reason for Podosek's decision. Circumstantial evidence can be of three types, including suspicious timing, ambiguous statements, or other bits and pieces from which a discriminatory intent can be drawn. Other circumstantial evidence includes evidence that female employees similarly situated to plaintiff received better treatment than he. Farr v. St. Francis Hospital and Health Centers, 570 F.3d 829, 832 (7th Cir. 2009).

To establish his claim under the indirect method, plaintiff must meet the test set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 1973), modified for reverse sex discrimination cases. Farr, 570 F.3d at 833. Under McDonnell Douglas, to establish a prima facie case, plaintiff must show that he is a member of a protected class, that he was meeting defendant's legitimate expectations, that he suffered an adverse employment action, and that similarly situated individuals were treated more favorably than he was. Id. When, as in the instant case, plaintiff is a member of a "majority" (a male plaintiff alleging gender discrimination) he must "set out background circumstances that show that [defendant]

8

discriminates against the majority," or he must show that there is something "fishy" going on. Id. If plaintiff establishes a prima facie case, then defendant must provide a non-discriminatory reason for the employment action. Once defendant meets that burden, plaintiff must show that the reason is pretextual. Id.

As Farr points out, the "goal of these tests is to determine whether discrimination is afoot." Id. at 833. In the instant case, neither test reveals discrimination. As noted, plaintiff's only evidence is that Mortakis received light duty and he did not. Plaintiff points to no suspicious timing, ambiguous statements or other evidence from which an inference of discriminatory intent could be inferred. Even if Podosek (or Biagi) told plaintiff that the department did not have a light duty position, there is no evidence that the statement was untrue. The department was small and had no official policy. Podosek testified that he had never placed anyone on light duty before Mortakis, and there is no evidence to suggest that he was lying. The mere fact that Podosek placed Mortakis on what could be considered light duty after receiving a note from her doctor (plaintiff failed to provide a doctor's note) is simply not enough to demonstrate discriminatory intent, especially when, as defendant argues, Illinois law specifically makes it an unlawful employment practice for a public employer to refuse to temporarily transfer a pregnant female police officer to a less strenuous position for the duration of her pregnancy if requested on advice of a physician. 775 ILCS 5/2-102(H).

Nor is there any evidence that defendant, or defendant's police department, discriminates against males. Indeed, the overwhelming majority of the department was male. There is simply no evidence to suggest that Podosek's explanation for the different treatment, that plaintiff never provided a doctor's note, while Mortakis did, requiring him to comply with the law, is anything

9

but the truth. There is certainly no evidence of anything fishy going on that would create an inference of discrimination against males. Accordingly, defendant's motion for summary judgment is granted as to Count I.

**Count II - Title VII Retaliation**

In Count II, plaintiff alleges that he was retaliated against for reporting defendant's alleged discriminatory actions to the EEOC. He claims to have suffered two distinct acts of retaliation. First, he claims that Podosek retaliated against him by eliminating the K9 program and stripping plaintiff of his position as K9 officer. Next he claims that Ricchio retaliated against him by seeking his termination.

Title VII prohibits an employer from discriminating against an employee because he has opposed any practice made an unlawful employment practice or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; (3) there is a causal link between the protected activity and the adverse action. If plaintiff establishes a prima facie case, the employer must then articulate a legitimate non-discriminatory reason for the adverse action. Once the employer does so, the burden shifts back to plaintiff to demonstrate that the proffered reason is a pretext for discrimination. Essex v. UPS, 111 F.3d 1304, 1308 (7th Cir. 1997).

Plaintiff cannot establish a prima facie case of retaliation with respect to his first claim, that Podosek eliminated plaintiff's position as K9 officer, because plaintiff reported gender discrimination to the EEOC. Plaintiff argues that when Podosek called him in in February 2009

because of the alleged alcohol incident, Podosek berated him for filing an EEOC charge. Plaintiff further contends that Podosek terminated the K9 program because of that EEOC charge. But, plaintiff did not make a formal EEOC charge until May 2009, after Podosek had resigned and at least three months after the alleged retaliation. Plaintiff did fill out an online EEOC Intake Questionnaire in December 2008, but plaintiff was adamant that he told no one about that and Podosek testified without contradiction that he knew nothing about it. There is good reason for Podosek's position, because the EEOC does not send intake questionnaires to the employer. Only the formal charge is sent, and that was not made until months later. Novitsky v. American Consulting Engineering, LLC, 196 F.3d 699, 702 (7th Cir. 1999). Therefore, plaintiff cannot establish a causal connection between his EEOC Intake Questionnaire and Podosek's decision to terminate the K9 program.

Additionally, even if plaintiff could establish a causal connection, defendant has articulated a number of reasons for the termination of the program, including lack of funds and Selene's inability to detect drugs. Plaintiff has presented no evidence to suggest that those reasons are pretextual. Accordingly, defendant's motion for summary judgment on this claim is granted.

Plaintiff's claim that Ricchio retaliated against him for filing the formal EEOC charge is another matter. Ricchio's efforts to terminate plaintiff are replete with references to plaintiff's EEOC charge. Defendant argues that plaintiff's charge was in May 2009 while Ricchio's termination efforts began 11 months later in April 2010. There is no evidence, however, of when Ricchio first learned of the charge, and the short passage of time does not, by itself, demonstrate that Ricchio's actions were not retaliatory.

Defendant also argues that two intervening events occurred shortly before plaintiff was interrogated and formal charges brought against him. First, plaintiff executed the affidavit used in support of TNK9's lawsuit against the Village, and second, was Village employee Bridgett Bagetto's police report alleging that plaintiff harassed her by repeatedly requesting his medical records. It is true that intervening causal events may break a chain of causation linking two events. See Gleason v. Mesiorw Financial, Inc., 118 F.3d 1134, 1147 (7th Cir. 1997). Although these two events might have been sufficient grounds for Ricchio's actions, they do not explain Ricchio's repeated references to plaintiff's EEOC charge and thus do not break the chain as a matter of law.

Defendant does argue and Ricchio testified that he was interested in plaintiff's EEOC charge only because it was filed by the same lawyers who were representing TNK9 in its suit against the Village. Whether that was in fact defendant's motivation, however, is a question of credibility that cannot be decided on summary judgment. Accordingly, defendant's motion for summary judgment on plaintiff's claim that defendant sought his termination because he had filed an EEOC charge is denied.

**Count III - FLSA**

In Count III, plaintiff claims that defendant has violated the FLSA by failing to pay him for 528 hours of overtime logged while caring and maintaining Selene. Defendant argues that the majority of plaintiff's claim is barred by the FLSA's two year statute of limitations. See 29 U.S.C. § 255(a). Plaintiff counters that the two year statute may be extended to three years if there is evidence that an employer acted willfully in violation of the FLSA. Blankston v. Illinois, 60 F.3d 1249, 1253 (7th Cir. 1995). For purposes of the FLSA, willful is defined as

merely requiring proof that the defendant's actions were knowing and voluntary and that it knew or reasonably should have know that its actions violate the statute.

Plaintiff and Podosek have different versions of what was promised to plaintiff when he became the K9 officer. What is undisputed, however, is that during the period in question all requests for payment for overtime had to be submitted through overtime slips. Plaintiff never submitted any form of documentation, let alone the proper form. Because plaintiff worked away from the station when he trained Selene, defendant had no way to know how many, if any, overtime hours plaintiff worked, unless such documentation was provided. Thus, plaintiff cannot establish that defendant willfully denied him overtime wages. That means that the two year statute of limitations applies. Because plaintiff filed the instant case on June 3, 2010, he cannot recover for any work performed prior to June 3, 2008. Plaintiff was on medical leave and not working from June 3, 2008 until January 25, 2009. Therefore, defendant's motion for summary judgment is granted on Count III except for the period between January 25, 2009 to February 9, 2010, when the K9 program was terminated.

## Count IV - Breach of Contract

In Count IV, plaintiff alleges that defendant breached the K9 contract by failing to maintain the K9 program for the "agreed upon five year period." The K9 contract, which was apparently drafted by Hockett, is not exactly a model of clarity. The provision in question, however, is clear enough:

> [W]hen TNK9, Inc. places one of its animals with a officer as their handler, the animal becomes part of that officers family and home as well as their new partner. The animal then becomes that officers property but the agency retains the legal right of use with that said animal for the period of no less than five years from the time the agency receives the animal. Should the officer quit or be removed for the said agency for any reason, then <u>the agency is entitled to full reimbursement</u>

13

>  for the training and expense of their entire K-9 program with said animal from the officer, The animal is not to be removed from the handler/owner and by the signing of this contract by all parties the officer/handler agrees to reimburse the agency for all expenses should they violate this contract for any reason and not fulfill their five year term from the date of receipt of said animal. (Emphasis in original).

Nothing in this provision, or any other part of the contract, required defendant to maintain the K9 program for five years. The provision gives defendant the legal right to use Selene for a period of no less than five years, if it so desired. The provision required plaintiff, who apparently was given ownership of the dog, to make the dog available for use by defendant. Thus, plaintiff's breach of contract claim fails as a matter of law and defendant's motion for summary judgment on Count IV is granted.

**Count V - Illinois Whistleblower Act**

Finally, in Count V plaintiff alleges that defendant retaliated against him for reporting Devries's violations and Ricchio's "Miranda" order to the mayor and for submitting his affidavit in the KTN9 lawsuit, in violation of the Illinois Whistleblower Act, 740 ILCS 174/1 et seq., which in general prevents an employer from adopting any rule or regulation that would prevent an employee from disclosing information to a government or law enforcement agency if the employee has reasonable cause to believe that the information disclosed a violation of a state of federal law, rule or regulation. 740 ILCS 174/10. The Act also prevents an employer from retaliating against an employee for disclosing such information in a court or any other proceeding. 740 ILCS 174/15(a).

Defendant argues that it is entitled to summary judgment on this count because plaintiff did not have reasonable cause to believe that any of the information he disclosed showed a violation of a state or federal law, rule or regulation. Nonsense. Plaintiff reported that Devries

14

had fraudulently requested and received pay for time Devries says he spent in court. Assuming that plaintiff's version of the events are true, he had every reason to believe that Devries was violating state law. As to his affidavit, he claims he was ordered to spay the dog and that to do so would be a violation of the contract as well as a state criminal law. Defendant argues there could be no violation of the law because under the contract plaintiff owned the dog, but that is not entirely clear, and in fact was being litigated in the state court action. Whether Ricchio's actions were taken in retaliation for plaintiff's actions, or for other legitimate or illegitimate reasons, is a factual question that cannot be decided on summary judgment. Accordingly, defendant's motion for summary judgment on Count V is denied.

## CONCLUSION

For the reasons described above, defendant's motion for summary judgment is granted as to Count I. The motion is granted as to the claim in Count II that Podosek retaliated against plaintiff by disbanding the K9 program, and denied as to the claim that Ricchio retaliated against plaintiff by seeking plaintiff's termination. The motion is granted as to the claims in Count IV except as to the period between January 25, 2009, to February 9, 2010. The motion is granted as to Count IV and denied as to Count V. This matter is set for a report on status on January 22, 2013, at 9:00 a.m.

**ENTER:** **January 14,2 013**

_____

**Robert W. Gettleman**
**United States District Judge**